UNITED STATES *ex rel.* ATTORNEY GENERAL *v.* PITTSBURGH & L. E. R. Co.

*(District Court, W. D. Pennsylvania.*   January 18, 1886.)

1. NAVIGABLE RIVERS—BRIDGES—ACTION BY UNITED STATES.

   The United States may maintain a suit to compel a company assuming to exercise the authority conferred by the act of Congress of December 17, 1872, (authorizing and regulating bridges over the Ohio river,) to comply with the provisions thereof, or to abate as a public nuisance an unlawful structure so erected, when an obstruction to navigation.

2. SAME—OBSTRUCTION—JURISDICTION OF DISTRICT COURT.

   Litigation between the government and such company touching an obstruction to the navigation of the river, created by the construction of a bridge under said act, presents a cause within the terms of the sixth section, and hence is cognizable by the designated district court.

3. SAME—INFORMATION IN EQUITY—PROPER REMEDY.

   In such case the appropriate remedy is by an information at the suit of the attorney general in equity.

4. SAME—ORDER OF SECRETARY OF WAR—DIKE.

   A company proposing to construct a bridge over the Ohio river, under said act, submitted its designs, etc., to the secretary of war, who, pursuant to the provisions of the act, convened a board of engineers to examine the case, which board, after hearing the parties interested, recommended certain changes of location and plan, a dike 300 feet long being one of the new features so recommended. The company, accepting the recommendations of the board, modified its plan to conform thereto, and the same was approved by the secretary of war. Official notice of such approval having been given to the company, it proceeded to construct its bridge at the appointed location in accordance with the approved plan. After the piers were erected, and the superstructure almost finished, the secretary of war made an order directing the company to construct a dike 918 feet in length. *Held,* that the secretary of war had no authority to make that order, and the company was not bound to comply with it.

In Equity.

*Wm. A. Stone,* U. S. Atty., for the United States.

*D. T. Watson,* for defendant.

ACHESON, J.   While the jurisdiction of this court in this cause has not been called in question, but has been tacitly conceded by the defendant's learned counsel, it nevertheless is proper to examine the grounds upon which our authority rests. The subject-matter of the suit is a bridge constructed by the defendant over the Ohio river, near the town of Beaver, in the Western district of Pennsylvania, under the act of congress of December 17, 1872, (17 St. at Large, 398,) entitled "An act authorizing the construction of bridges across the Ohio river, and to prescribe the dimensions of the same;" the complaint, in substance, being that the defendant's said bridge has not been constructed in accordance with the limitations and provisions of said act, but in violation thereof; and that, as built and maintained, it is an unlawful obstruction to the navigation of said river, and a public nuisance. The sixth section of the act contains the provision following:

"And in case of any litigation arising from any obstruction, or alleged obstruction, to the navigation of said river, created by the construction of any

bridge under this act, the cause or question arising may be tried before the district court of the United States of any state in which any portion of said obstruction or bridge touches."

Now, congress having legislated on the subject of the erection and maintenance of bridges over the Ohio river, and defined what shall be a lawful structure, I cannot doubt that the United States may maintain a suit to compel a company, assuming to exercise the authority conferred by the said act, to comply with the terms thereof, or to abate as a public nuisance an unlawful structure so erected, when an obstruction to the free navigation of the stream. *Dugan* v. *U. S.*, 3 Wheat. 173; *U. S.* v. *Tingey*, 5 Pet. 115. And litigation between the government and such company, touching an obstruction to the navigation of the river created by the construction of a bridge under the said act, would seem clearly to present a cause within the terms of the above-quoted clause of the sixth section, and hence cognizable by the proper district court. But as an indictment against the bridge as a nuisance is not maintainable,—no such proceeding having been authorized by congress,—the appropriate remedy is by an information at the suit of the attorney general in equity, as here adopted. *State* v. *Wheeling Bridge Co.*, 13 How. 518; Story, Eq. Jur. § 921 *et seq.*; Wood, Nuis. 813.

Being thus assured of the jurisdiction of the court, I pass to a consideration of the merits of the case. As already stated, the bridge in question was erected under the above-recited act of congress, which prescribes the minimum height and width of the channel spans, and other requirements. The fourth section of the act provides that the person or company proposing to erect a bridge across the Ohio river shall submit to the secretary of war, for his examination, a design and drawings of the bridge and piers, and a map of the location, giving, for the space of at least one mile above and one mile below the proposed location, the topography of the banks of the river, the shore-lines, at high and low water, the direction of the current at all stages, and other specified particulars, and shall furnish such other information as may be required for a full and satisfactory understanding of the subject; "and, if the secretary of war is satisfied that the provisions of the law have been complied with in regard to location, the building of the piers may be at once commenced; but, if it shall appear that the conditions prescribed by this act cannot be complied with at the location where it is desired to construct the bridge, the secretary of war shall, after considering any remonstrances filed against the building of said bridge, and furnishing copies of such remonstrances to the board of engineers provided for in this act, detail a board, composed of three experienced officers of the corps of engineers, to examine the case; and may, on their recommendation, authorize such modifications in the requirements of this act as to location and piers as will permit the construction of the bridge, not, however, diminishing the width of the spans contemplated by this act: provided,

that the free navigation of the river be not materially injured thereby." The defendant company having submitted to the secretary of war the design and drawings for its proposed bridge and piers, and a map of the location, and remonstrances having been filed by those interested in the navigation of the river against the building of the bridge, the secretary, not being satisfied with the proposed plan, etc., detailed a board of engineers, conformably to the provisions of the act, to examine the case. That board, after visiting the ground and hearing the parties interested, made report to the chief of engineers, on August 15, 1877, which report was approved by the secretary of war on August 30, 1877. This report contains the following recommendations, viz.:

"And inasmuch as the river men whom they [the board] have consulted are almost unanimous in desiring that the bridge should be built further up stream, they would recommend that this be done, and that a site between 300 and 400 feet higher up be chosen, giving the company a margin of 100 feet in order to adapt their line to the ground in a manner as advantageous as possible. But, even with this change, the channel space will often be difficult to run, as tows, after flanking around the Phillipsburg point, cannot always straighten up in time to run straight through the channel space. For these reasons, the board would recommend that the channel space be increased to 425 feet in the clear, and that a smooth guiding dike, 300 feet long, be built up stream from the left channel pier. This dike should be as high as the 15-foot stage in the river, and should bend gently towards the bank, so as to reduce the space for water behind it, and to deflect the current into the channel space. The left channel pier should be placed 150 feet from the bluff bank. The span next north of the channel space should be also made a through bridge."

At a meeting of the board of directors of the defendant company, held September 5, 1877, the foregoing recommendations of the board of engineers were acceded to by the company; and a written acceptance thereof, signed by the president of the company, and under its corporate seal, was immediately transmitted to the secretary of war, by whom it was received and filed. On September 12, 1877, the defendant's engineer submitted a map exhibiting the plan and location of the proposed bridge, modified so as to conform to the above recommendations, to Maj. William E. Merrill, of the corps of engineers, and the officer in charge of the improvement of the Ohio river; who, finding it to conform to the above expressed views of the board of engineers, forwarded it to the chief of engineers, upon whose recommendation the secretary of war, on September 21, 1877, approved the modified plan and location as shown on said map; and official notice of such approval was communicated to the president of the defendant company on September 24, 1877. Shortly thereafter the company began the erection of the piers of the bridge at the changed location, in conformity with the modified plan. The piers were ready for the superstructure early in July, 1878, and the bridge (save the dike) was completed by September 21, 1878, on which day the first train ran over it. In the mean time, about June 12, 1878, after the piers

of the bridge were finished, the Pittsburgh Coal Exchange presented a memorial to Lieut. F. A. Mahan, corps of engineers, then having in charge the improvement of the Ohio river, setting forth that, since the erection of the channel piers of this bridge, it had been found that a dike of but 300 feet, as recommended by the board of engineers, would be "useless for the purpose demanded," and that it ought to be lengthened 700 feet. Maj. Merrill, having investigated the matter, on August 26, 1878, reported to the chief of engineers, as his opinion, "that a 300-foot dike will not suffice at this point, and that an extension of 618 feet is essential to the security of navigation;" and, upon the recommendation of the chief of engineers, the secretary of war, on September 4, 1878, made an order, which was served on the defendant company September 7, 1878, directing that the dike should be "extended to the main shore line 918 feet," and that the defendant company be required to make such extension. There is no satisfactory evidence that the defendant ever assented to this order, or agreed to comply therewith. Indeed, just the reverse is shown. The letter to Maj. Merrill, written by the company's chief engineer, on November 8, 1878, at least as explained by his testimony, does not import an undertaking to build a dike 918 feet long at the expense of the company; and, if it does bear such construction, he had no authority so to bind the company.

Whether the order of the secretary of war, made September 4, 1878, was obligatory upon the defendant is the most important question in this case, and the one first to be considered. So far as I am informed, or can discover, the secretary had no authority to make that order, unless it was conferred upon him by the act of December 17, 1872. But I search that act in vain for this authority. Certainly no express grant of such power to the secretary of war is to be found in the act, and I think no such implied authority is thereby given to him. It will be observed that the secretary had approved the recommendation of the board of engineers which prescribed a dike of only 300 feet in length, and the defendant had accepted that recommendation, and, as is shown, in all other particulars had constructed its bridge in strict conformity with the views of the board of engineers, which the secretary had finally approved on September 21, 1877. Now, by that approval, it seems to me the secretary exhausted his authority in the premises. At any rate, it was too late for him to withdraw or modify his approval after the company had acted upon it. It is true that the seventh section of the act provides that if "any change be made in the plan of construction of any bridge constructed under this act, during the progress of the work thereon, or before the completion of such bridge, such change shall be subject to the approval of the secretary of war." But this implies a voluntary change by the party erecting the bridge. The sanction of such change is a very different thing from a compulsory order modifying an approved and adopted plan of construction. Moreover, by the terms of the act,

there is an express reservation to congress of the right to direct any alteration of any bridge constructed under the act at the expense of the owners thereof. And this reservation negatives the idea that the secretary of war was invested by the act with the authority which he undertook to exercise by his order of September 4, 1878.

The conclusion thus reached finds confirmation in subsequent legislation. By the eighth section of the act of congress of July 5, 1884, (St. First Sess. Forty-eighth Cong. 148,) it is enacted that whenever the secretary of war shall have good reason to believe that any railroad or other bridge, constructed or to be constructed over any of the navigable waters of the United States, is an obstruction to the free navigation thereof by reason of difficulty in passing the draw opening or raft span by rafts, steam-boats, or other water-craft, the secretary, on satisfactory proof thereof, shall require the company, or persons owning such bridge, at their own expense, to provide aids to navigation in the form of booms, dikes, piers, and other suitable structures for the guiding of rafts, steam-boats, and other water-craft through such opening or span ; and in the case of the failure of such company or persons, within a reasonable time, so to do, the said secretary shall cause such additional structures to be built, the cost thereof to be recovered by proceedings instituted in the name of the United States, etc. This, it would seem, was the first general law which clothed the secretary of war with such power; and, for want of then existing authority in him to make the order of September 4, 1878, it was not binding upon the defendant, and cannot be enforced in this suit, nor can the defendant's bridge be adjudged an unlawful structure by reason of the company's failure to obey that order.

I reach this conclusion with the less reluctance because of the above-recited law of July 5, 1884, the provisions of which seem completely to cover the case of the defendant's bridge, affording a simple and ample remedy for the grievance here complained of. In this connection it may be remarked that the act of December 17, 1872, expressly reserves to congress the right of amendment by such a law as that of July 5, 1884, so as to prevent or remove obstructions to the navigation of the river, without any pecuniary liability on the part of the government on account of such amendment of said act.

As it is shown, and indeed is admitted, that since this suit was commenced the defendant has removed the "rip-raps," forbidden by the third section of the said act of 1872, and all the obstructions to navigation mentioned in the eighth paragraph of the bill, that branch of the case requires no discussion.

There remains, then, for present consideration, only one other matter, viz., the "smooth guiding dike 300 feet long," which, beyond contestation, the defendant company became bound to construct. That dike has not been constructed either in whole or in part. The company excuses itself for not building it on the ground of the controversy which sprang up as to the kind of dike to be constructed,

the government officials insisting upon a dike conforming to the order made by the secretary of war on September 4, 1878; and if the fact of such controversy be not, in strictness of law, and for all purposes, a full justification to the defendant, it at least relieves the company from any charge of willful default. The defendant was always willing and ready to build the dike as originally recommended and decided on. Indeed, in the contract for its bridge such a dike was included. That dike, however, was to "bend gently towards the bank, so as to reduce the space for water behind it." But the substitution of a dike 918 feet long involved a change in the shape and location of the first 300 feet running up stream from the left channel pier, as appears from the letter on that subject from Lieut. Mahan to the defendant's engineer, and otherwise. Nevertheless, the defendant company, in its answer, avows its willingness and readiness to build, at its own expense, the first 300 feet of the longer dike on the new line. But whether it be desirable now to enter a decree to that effect admits of grave question, in view of the possible injurious result to navigation from constructing only 300 feet of dike. Among the proofs here, is an official report touching this bridge of a board of army engineers, dated October 25, 1883, in which is expressed the opinion that "it is inexpedient, in the interests of navigation, to build a guiding dike until means are available for giving it the full length of about 918 feet." In view of that opinion, sustained as it is by other evidence, and the bearing which the act of July 5, 1884, has upon the whole case, the court will forbear making any order until the government shall be further heard in the matter.